1

2

3

4

5

6

7

8                              UNITED STATES DISTRICT COURT

9                            SOUTHERN DISTRICT OF CALIFORNIA

10

11   MARLENE C. PERRY,                 )   Case No. 07-CV-0276-L (JMA)
                                        )
12                    Plaintiff,        )   **REPORT AND RECOMMENDATION OF**
                                        )   **UNITED STATES MAGISTRATE JUDGE**
13   v.                                 )   **RE (1) GRANTING IN PART AND**
                                        )   **DENYING IN PART PLAINTIFF'S**
14   MICHAEL J. ASTRUE, Commissioner    )   **MOTION FOR SUMMARY JUDGMENT**
     of Social Security,                )   **[DOC. NO. 15] (2) GRANTING IN**
15                                      )   **PART AND DENYING IN PART**
                      Defendant.        )   **DEFENDANT'S CROSS-MOTION FOR**
16                                      )   **SUMMARY JUDGMENT [DOC. NO.**
                                        )   **16], AND (3) REMANDING CASE**
17   _____   )   **FOR FURTHER PROCEEDINGS**

18

19        Plaintiff Marlene C. Perry ("Plaintiff") seeks judicial

20   review of Defendant Social Security Commissioner Michael J.

21   Astrue's ("Defendant") determination that she is not entitled to

22   disability insurance benefits.  Plaintiff has filed a Motion for

23   Summary Judgment and Defendant has filed a Cross-Motion for

24   Summary Judgment.  For the reasons set forth below, the Court

25   recommends that Plaintiff's motion be **GRANTED IN PART** and **DENIED**

26   **IN PART**, that Defendant's motion be **GRANTED IN PART** and **DENIED IN**

27   **PART**, and that the case be remanded for further proceedings.

28   //

                                                                   07cv0276

## I.   PROCEDURAL HISTORY

Plaintiff filed an application for disability insurance benefits on or around July 7, 2004 alleging a disability onset date of January 1, 2001.  (Admin. R. at 54-57.)  Plaintiff's claim was denied initially on August 3, 2004, and again upon reconsideration on December 8, 2004.  (Id. at 22-26, 30-34.) Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (Id. at 35.)  An administrative hearing was conducted on October 18, 2005 by ALJ James S. Carletti, who determined that Plaintiff was not disabled.  (Id. at 14-19.)  Plaintiff requested a review of the ALJ's decision; the Appeals Council for the Social Security Administration denied Plaintiff's request for review on December 5, 2006.  (Id. at 4-7.)  Plaintiff then commenced this action pursuant to 42 U.S.C. § 405(g).

## II.   FACTUAL BACKGROUND

Plaintiff was born on September 19, 1964, and completed high school in 1983.  (Id. at 54, 67.)  She entered the United States Army after high school and served on active duty through 1989. (Id. at 279.)  She remained in the Reserves, and was deployed to the Persian Gulf in 1990.  (Id.)  She returned from the Gulf War in 1991.

Since leaving the Army, Plaintiff has worked as a nurse's assistant (1993-96), customer service representative (1998-99), sales representative (1999), package handler (1999-2000), and job coach (2000).  (Id. at 72.)  Plaintiff attended a computer technician program between 2000 and 2004 and earned her Associate's Degree.  (Id. at 95, 213, 426, 431.)

Plaintiff alleges disability due to fibromyalgia, chronic

fatigue syndrome, and depression.  (<u>Id.</u> at 63.)  She attributes her symptoms to her involvement in the Gulf War.  (<u>Id.</u> at 213, 278.)  Plaintiff has received a disability rating of 30% from the Department of Veterans Affairs ("VA"), for which she receives a pension.  (<u>Id.</u> at 424.)

## III.  MEDICAL EVIDENCE

### A.  Medical Records

Virtually all of the medical records contained in the administrative record before the Court relate to treatment received by Plaintiff at the VA.  On April 11, 2000, Plaintiff underwent a mental health evaluation pursuant to a referral from her primary physician.  (<u>Id.</u> at 277-80.)  Plaintiff complained of depression, anxiety, and difficulty controlling her anger.  (<u>Id.</u> at 277.)  She described sleep difficulties, lack of appetite, poor concentration, and poor short-term memory.  (<u>Id.</u>)  She stated that headaches, joint pain, sinus problems, and gastrointestinal problems precluded her from working or attending classes.  (<u>Id.</u>)  Plaintiff also reported difficulty communicating with her two teenage sons, ages 12 and 14, who she was raising on her own.  (<u>Id.</u> at 277-79.)

Plaintiff, a native of Trinidad (<u>id.</u> at 343), reported that she was not a U.S. citizen while serving in the Gulf War and thus was not allowed to perform the duties for which she was trained. She was also reportedly separated from her unit, felt castigated, and believed that she was treated very poorly by her superiors. (<u>Id.</u> at 278-79.)  She revealed that she still carried a large amount of anger regarding those conditions.  (<u>Id.</u> at 279.)  She did not see any combat in the war.  (<u>Id.</u> at 294.)  Plaintiff was

diagnosed with Depressive Disorder by Dr. Shannon Chavez, a VA
psychiatrist.  Plaintiff decided to pursue individual therapy,
was encouraged to take an antidepressant, and was prescribed
Trazodone to help with her sleep problems.  (<u>Id.</u> at 280, 343-44.)

On June 15, 2000, Plaintiff saw Dr. Shreeti Patel for
migraine headaches, neck pain, and joint pain in her ankle and
knee.  (<u>Id.</u> at 349.)  While the pain had persisted for ten years,
it had worsened in the past months.  (<u>Id.</u>)  Dr. Patel noted
foraminal narrowing at C5-C6 which possibly accounted for
Plaintiff's right C6 radiculopathy and migraines.  (<u>Id.</u> at 349-
50.)  Plaintiff, however, was not interested in surgery.  (<u>Id.</u> at
349.)  Dr. Patel suggested a diagnosis of fibromyalgia and
recommended that Plaintiff read books by the Arthritis Foundation
to obtain more information.  (<u>Id.</u> at 350.)

Dr. Chavez, the psychiatrist, saw Plaintiff on two
additional occasions in 2000.  (<u>Id.</u> at 342-43.)  Plaintiff had
much ambivalence about taking medications for her depression, and
reported that she had ceased attending group therapy sessions as
she found them ineffective.  (<u>Id.</u> at 343.)  Dr. Chavez prescribed
trial courses of Nefazodone and Wellbutrin, both antidepressants.
(<u>Id.</u> at 342-43.)

Plaintiff met regularly with Dr. Ariel J. Lang, a staff
psychologist at the VA, over the course of five years (2000-2005)
for individual psychotherapy sessions.  Between July and December
2000, Plaintiff complained to Dr. Lang of physical pain that was
beginning to limit her daily activities.  (<u>Id.</u> at 215.)
Plaintiff was frustrated with the medical system because she had
not been able to find anything to adequately diagnose her

07cv0276

condition or alleviate her pain.  (<u>Id.</u> at 210, 213.)  After
reading about the experiences of other veterans who had served in
the Persian Gulf, Plaintiff began to attribute her own symptoms
to her service in the war, which Dr. Lang agreed to be the case.
(<u>Id.</u> at 213, 215-16.)

Plaintiff advised Dr. Lang that she felt like her life was
passing her by, so she began the process of enrolling in a
vocational education program through the VA.  (<u>Id.</u> at 213-15.)
She began taking computer technician classes in late 2000.  (<u>Id.</u>
at 213.)  Dr. Lang encouraged Plaintiff to increase her exercise
and reintroduce certain foods that Plaintiff had eliminated
because she believed they exacerbated her symptoms.  (<u>Id.</u> at
211.)  Overall, Dr. Lang felt that she had little to offer
Plaintiff, as few of her treatment suggestions were any help in
treating Plaintiff's symptoms.  Dr. Lang noted, however, that
Plaintiff seemed to benefit from the therapy sessions as a source
of support.  (<u>Id.</u>)

During the first half of 2001, Plaintiff generally reported
to Dr. Lang that her symptoms remained unchanged.  (<u>Id.</u> at 208,
210.)  Although she initially reported doing well in school (<u>id.</u>
at 210), she expressed doubt about the skills she was building
and eventually started missing school (<u>id.</u> at 207-09).  She had a
confrontation with an instructor at school and even stopped
studying because of her dislike for the teacher.  (<u>Id.</u> at 206-
07.)  She scheduled an appointment with a Gulf War Illness
specialist in Los Angeles in March 2001, as she was dissatisfied
that her treatment providers at the VA had been unable to
adequately address her symptoms.  (<u>Id.</u> at 209.)  Dr. Lang again

07cv0276

reported that there was not much beyond providing support that
she could offer Plaintiff as she had tried many other approaches
with little success.  (<u>Id.</u> at 210.)

Plaintiff received treatment over the course of 2001 for her
migraine headaches from Drs. Daniele Anderson and Alissa J.
Gilles, neurologists.  (<u>Id.</u> at 191-93, 224-28.)

In her sessions with Dr. Lang during the latter half of
2001, Plaintiff became more dissatisfied with the medical
treatment she was receiving from the VA.  (<u>Id.</u> at 205.)  She
applied for MediCal as a means of obtaining second opinions.
(<u>Id.</u>)  Plaintiff was still in school but did not feel that she
was learning anything.  (<u>Id.</u> at 205-06.)  She reported that
studying exacerbated her symptoms, as did her part-time work
study job.  (<u>Id.</u> at 204.)  Dr. Lang observed that Plaintiff
appeared to be "more and more defeated."  (<u>Id.</u> at 205.)
Plaintiff was referred to physical therapy at the end of 2001 by
Dr. Rashida Abbas, a staff physician, due to "nearly constant"
ankle and knee pain.  (<u>Id.</u> at 329-30.)

Plaintiff underwent a physical therapy evaluation in
February 2002.  (<u>Id.</u> at 301-04.)  Plaintiff's pain had worsened
such that even her skin was hypersensitive.  (<u>Id.</u> at 301.)  The
physical therapist, Mirna Zatarain-Beckwith, recommended pool
therapy and a home exercise program.  (<u>Id.</u> at 303.)  Plaintiff
stopped the pool therapy after her first time because she got
very cold when she left the pool and did not feel well for days
afterward.  (<u>Id.</u> at 300.)  The physical therapist issued

07cv0276

Plaintiff a TENS[1] unit instructed her to continue with her home
exercises, and discharged her from physical therapy.  (Id.)  That
same month, Plaintiff reported to Dr. Abbas that the TENS unit
helped her ankle and back pain, but that Propranolol had not
relieved her headaches.  (Id. at 327.)  Plaintiff declined a
referral to the Chronic Benign Pain program due to schedule
conflicts.  (Id.)  She did, however, request a referral for
acupuncture.  (Id. at 328.)

During Plaintiff's sessions with Dr. Lang in early 2002,
Plaintiff stated that she continued to feel frustrated with her
physical symptoms, school, and the VA medical system.  (Id. at
202-04.)  Plaintiff had done well in some of her general
education classes, but had failed one of her exams at school.
(Id. at 203.)  Plaintiff was upset that her disability claim had
been denied, but Dr. Lang praised her for using some of the
skills she had learned in therapy to deal with the situation
appropriately.  (Id.)  Dr. Lang noted that Plaintiff's
psychological symptoms were related to Plaintiff's "poorly
explained" physical symptoms and the related changes in her
lifestyle.  (Id. at 202, 204.)  Over the long run, Dr. Lang hoped
to increase Plaintiff's level of functioning.  (Id. at 203.)

In July 2002, Plaintiff reported to Dr. Abbas that her ankle
pain was ongoing and that it was, if anything, worse.  (Id. at
322.)  She had been unable to exercise due to her pain, was

---

[1]Transcutaneous electrical nerve stimulation is a therapy
sometimes used to treat localized or regional pain.  During TENS
therapy, electrodes deliver electrical impulses to nearby nerve
pathways which can help control or relieve some types of pain.
See http://mayoclinic.com/health/tens/AN01946 (as visited Feb. 3,
2009).

having trouble sleeping, and was lacking in motivation.  (Id.)
She stated that she was attending classes for her children only
and that she felt hopeless about her future.  (Id.)

Plaintiff saw Dr. Dhyanne Warner, staff psychiatrist, on
three occasions during the latter half of 2002.  (Id. at 234-36.)
Plaintiff reported that she had stopped seeing Dr. Lang as she
did not feel that therapy was helpful.  (Id. at 235.)  She stated
that she had no energy, was frightened to eat certain foods
because they could trigger a headache, and that she "hurt all the
time."  (Id. at 235-36.)  Dr. Warner prescribed Prozac, which
Plaintiff could not tolerate; Dr. Warner then recommended Celexa.
(Id.)  Over the course of three visits, Dr. Warner found that
Plaintiff had Global Assessment of Functioning ("GAF") scores of
60, 60, and 62.[2]  (Id. at 234, 235, 236.)  Plaintiff began
keeping a pain diary as a way to monitor her pain.  (Id. at
235.)[3]

Plaintiff attended the behavior medicine clinic at the VA in
late 2002 at Dr. Warner's suggestion.  (Id. at 309-14.)
Psychologist Pollyanna V. Casmar noted that it was her impression

---

[2]The Global Assessment of Functioning scale, or GAF scale, is a
numeric scale (0 through 100) used by mental health practitioners to
rate social, occupational, and psychological functioning, with lower
numbers representing more severe symptoms, difficulties, or
impairments.  The scale is presented in the Diagnostic and Statistical
Manual of Mental Disorders.  A GAF score between 51 and 60 suggests
"Moderate symptoms OR any moderate difficulty in social, occupational,
or school functioning."  A GAF score between 61 and 70 suggests "Some
mild symptoms OR some difficulty in social, occupational, or school
functioning, but generally functioning pretty well, has some
meaningful interpersonal relationships."  American Psychiatric
Association, Diagnostic and Statistical Manual of Mental Disorders,
Fourth Edition Text Revision (2000).

[3]The administrative record includes journal entries from 2001
(id. at 116-21) and 2004 (id. at 122-26), as well as undated journal
entries (id. at 127-41).

07cv0276

1  that Plaintiff had recognized that she must accept her pain and

2  live with it as a part of her life. (Id. at 310.)  Plaintiff

3  appeared to be eager to try new techniques to assist with the

4  pain and was hopeful that something would work. (Id.)

5      In December 2002, Plaintiff followed up with neurologist Dr.

6  Roy Yaari regarding her headaches. (Id. at 336-38.)  She

7  presented with her sister, a nursing student, who requested that

8  Plaintiff have a spinal tap and be worked up for Gulf War

9  Syndrome. (Id. at 337.)  Although Dr. Yaari explained that the

10 spinal tap was not indicated, both Plaintiff and her sister

11 insisted upon proceeding with one. (Id.)  Shortly thereafter,

12 however, Plaintiff called Dr. Yaari to cancel the appointment.

13 (Id. at 338.)  She agreed that it was likely not indicated, and

14 stated that she was going to see an outside neurologist. (Id.)

15     In early 2003, Plaintiff reported to Dr. Abbas that she had

16 applied for enrollment in a clinical trial at Johns Hopkins but

17 had been turned down due to her depression. (Id.)  She was

18 disappointed as she felt she was a good candidate for the trial

19 because of her generalized pain and fatigue and poor

20 concentration. (Id.)  She also revealed that she was failing

21 three of her courses at school. (Id. at 318.)

22     After a hiatus of eleven months, Plaintiff, at her own

23 request, resumed seeing Dr. Lang in March 2003. (Id. at 202.)

24 Plaintiff's primary complaint at that time was increased stress

25 after a wrongful eviction.  She was having a hard time feeling

26 relaxed at home, and found that some of her war experiences were

27 coming back to her.  Dr. Lang recommended that Plaintiff review

28 her coping skills in light of her new challenges. (Id.)  Dr.

Lang noted the following month that she was "unclear" about how
to move Plaintiff forward.  (Id. at 201.)  In June 2003, Dr.
Abbas reviewed information that Plaintiff had provided regarding
the Gulf War Syndrome study at Hopkins.  (Id. at 315.)  Plaintiff
and Dr. Abbas discussed pain management possibilities including
yoga, pool therapy, and acupuncture, as well as tilt table
testing, which was part of ongoing research into Gulf War-related
illnesses.  (Id. at 316.)  Dr. Abbas also noted that Plaintiff
had minimized her medications as none had been helpful.  (Id.)
X-rays taken of Plaintiff's ankles, legs, and knees in June 2003,
in relation to her chronic bilateral lower extremity pain, were
normal.  (Id. at 176-78.)

During a physical therapy evaluation in July 2003, Plaintiff
provided a comprehensive description of her complaints, including
bilateral shoulder pain, bilateral knee/lower extremity pain,
pain in her sacrum, headaches, numbness of her right lower
extremity from her knee to her foot, difficulty with sitting for
a long period of time, and depression.  (Id. at 283.)
Plaintiff's diagnosis was listed as chronic fatigue syndrome.
(Id. at 282.)  Plaintiff tried pool therapy again (id. at 250-53,
281-82) as well as yoga (id. at 276-77, 356-57), without success
(id. at 266).

In November 2003, Dr. Lang observed that Plaintiff "was much
the same with multiple complaints without successful resolution."
(Id. at 200.)  Plaintiff advised that she had failed one class
and withdrawn from another, leading Dr. Lang to initiate
discussions regarding a "more fruitful vocational path" for
Plaintiff.  (Id.)

07cv0276

On December 17, 2003, Plaintiff had a neuropsychological evaluation performed by Dr. Mindy S. Kane to assess her cognitive strengths and weaknesses to aid in choosing a vocational path. (Id. at 292-300.)  Plaintiff reported cognitive difficulties including problems with memory, concentration, and attention. (Id. at 293.)  She acknowledged occasional suicidal ideation but stated that it was "not serious."  (Id.)

Dr. Kane performed a series of tests on Plaintiff.  (Id. at 294-95.)  Plaintiff's overall intellectual function was in the average range, with a Full Scale IQ of 92.  (Id. at 295.)  Dr. Kane observed a significant discrepancy between Plaintiff's intellectual functioning and her academic attainment, which raised the possibility of a previously undiagnosed verbal learning disability.  (Id. at 299.)  Dr. Kane found that an optimal vocation for Plaintiff would be one which would utilize her strengths in visual-spatial skills, abstract reasoning, and arithmetic in a time-unlimited manner.  (Id.)  Dr. Kane concluded that Plaintiff should continue to receive treatment for her psychiatric symptoms as alleviation of those could produce beneficial effects on her cognitive abilities.  (Id.)

In early 2004, Plaintiff continued to express her concern about her vocational plan to Dr. Lang.  (Id. at 199.)  Dr. Lang noted that Plaintiff continued to exhibit depressive symptoms as well as anxiety, which was mostly related to time pressure.  (Id. at 198.)  Dr. Lang had some success using Eye Movement Desensitization and Reprocessing ("EMDR") to deal with Plaintiff's painful war memories, but after a few sessions, Plaintiff decided to discontinue that line of treatment.  (Id. at

07cv0276

196-98.)  Plaintiff returned to physical therapy in March 2004 due to an exacerbation of neck pain that she had experienced since December 2003.  (Id. at 272.)  Plaintiff explained that she had stopped using her TENS unit because it irritated her neck. (Id.)  She attended physical therapy sessions from April to July 2004 and obtained partial relief of her symptoms.  (Id. at 237-46, 270-71.)  Plaintiff also started receiving massage treatment in May 2004 which appeared to help her.  (Id. at 256-60, 167-70.) Plaintiff reported that she was taking a holistic approach to her health as she felt that other approaches had not worked for her. (Id. at 195.)  She explained that she was very careful about her diet and that she had had mercury removed from her dental work as she believed it was causing mercury toxicity.  (Id. at 195, 257, 260.)

In June 2004, Plaintiff told Dr. Lang that she felt good while visiting family in New York, including her sons, who by now lived with their grandmother.  (Id. at 167-68, 194.)  She had been feeling worse since her return home but still felt better than in preceding months.  (Id. at 194.)  She stated that she had read a book about fibromyalgia and chronic fatigue and believed that those diagnoses were appropriate for her.  (Id.)  Dr. Lang observed that Plaintiff appeared relieved to have found the fibromyalgia diagnosis and acknowledged that she had been "in denial" when this had been discussed with her in the past.  (Id.)

In August 2004, Plaintiff told Dr. Lang that she would continue to pursue alternative treatment when she was able to afford it.  (Id. at 169.)  She also advised that she had not done well in school during the last semester because of her symptoms.

1   (<u>Id.</u>)   In October 2004, Plaintiff received a pain assessment with

2   Dr. Marilyn Castle of the Anesthesiology Department at the VA,

3   who noted Plaintiff's history of chronic pain/fibromyalgia.  (<u>Id.</u>

4   at 162-63.)  She reported that massage had increased the

5   circulation to her legs and that it helped her neck pain for the

6   first day or two after each massage.  (<u>Id.</u> at 162.)  Dr. Castle

7   recommended that Plaintiff proceed with trigger point injections,

8   acupuncture, and muscle relaxers.  (<u>Id.</u> at 163.)  In November

9   2004, Plaintiff expressed to Dr. Lang her frustrations that the

10  VA did not offer alternative medicine options and that she did

11  not have sufficient income to pay for all of the care that she

12  wanted to receive.  (<u>Id.</u> at 161.)

13      Plaintiff continued with massage therapy into 2005, and

14  received a small amount of acupuncture, but her request for

15  hypnotherapy was denied.  (<u>Id.</u> at 373-76, 380, 391, 398-99.)  In

16  February 2005, Plaintiff reported to Dr. Lang that her depression

17  was "in check" and that it would not change until her pain got

18  better.  (<u>Id.</u> at 397.)  Dr. Lang reviewed depression treatment

19  options with Plaintiff, but noted that Plaintiff refused

20  medication, did not like group therapy, and that a number of

21  techniques had been tried to no avail.  (<u>Id.</u>)  Plaintiff told Dr.

22  Lang that she was doing "nothing" in terms of treatment except

23  waiting for massage to reduce her pain and hanging upside down as

24  she felt the right side of her body was shortening.  (<u>Id.</u>)  Dr.

25  Lang noted, "She is clear that she prefers to read books and

26  manage her treatment herself."  (<u>Id.</u>)

27      In September 2005, Dr. Lang completed a "Mental Impairment

28  Review Form" on behalf of Plaintiff.  (<u>Id.</u> at 361-64.)  Dr. Lang

07cv0276

indicated that Plaintiff's diagnoses included recurrent depressive disorder and fibromyalgia.  (<u>Id.</u> at 361.)  She assessed Plaintiff's current and past year GAF score at 51.  (<u>Id.</u> at 361; <u>see also</u> fn. 1, *supra*.)  Dr. Lang opined that Plaintiff's prognosis was poor, that her depression and fibromyalgia each exacerbated the other, and that she would have difficulty working a regular job on a sustained basis.  (<u>Id.</u> at 363.)  She estimated that Plaintiff would miss work more than three times per month due to her impairments.  (<u>Id.</u>)  Dr. Lang further opined that Plaintiff had "marked" limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace as a result of her mental impairments.  (<u>Id.</u>)

On June 5, 2006, <u>i.e.</u>, after the ALJ rendered his decision, Dr. Lang wrote a letter clarifying her previous assessment of Plaintiff's functioning.  (<u>Id.</u> at 417-18.)  She opined that Plaintiff had more than a mild impairment but that it did not quite fall into the serious range.  (<u>Id.</u> at 417.)  She also reiterated her opinion that Plaintiff's symptoms would interfere with her ability to hold a job.  (<u>Id.</u>)  Finally, although Dr. Lang acknowledged that Plaintiff had completed her Associate's Degree during the course of her treatment, she stated that Plaintiff's performance had been variable and that she had reported multiple difficulties with studying as well as many absences from school.  (<u>Id.</u>)

**B.   Vocational Records**

In December 2005, Plaintiff received a vocational assessment to identify her basic vocational skills.  (<u>Id.</u> at 407-14.)  The assessment resulted in the following recommendations:

Given Ms. Perry's performance during this assessment, return to competitive employment would appear questionable at this time.  Considering the client's report of neck and back discomfort with minimal physical exertion, she would appear to require a highly selective work environment.  The client's inconsistent attention to detail would appear to limit her ability to maintain accuracy.  In addition, the client's consistent below average work rate and aptitudes would adversely affect her employability.  It should be noted, the client advised she prefers to work by herself and would find it difficult working with others, or having close supervision.  This factor would also appear to limit the client's vocational options.

(Id. at 413.)

In May 2006, Linda Raffignone, a Vocational Rehabilitation Counselor with the VA, wrote a letter advising that Plaintiff had been working with the Vocational Rehabilitation division since 2000.  (Id. at 415.)  She indicated that because Plaintiff's physical and mental impairments had continued to plague her without improvement, the division had determined that it was "no longer feasible for Ms. Perry to return to work" and that it would focus instead on increasing Plaintiff's quality of life through Independent Living Services.  (Id.)

**IV.   THE ADMINISTRATIVE HEARING**

The ALJ conducted an administrative hearing on October 18, 2005.  (Id. at 420.)

**A.   Plaintiff's Testimony**

Plaintiff testified that she began to notice her symptoms after returning from the Gulf War.  (Id. at 424.)  She stated that she got out of the Army because of her disability and that she receives a disability pension of $850 per month.  (Id.)  Plaintiff stated that she has a disability rating of 30% connected to her service based on her joint, ankle, knee, and

07cv0276

sinus conditions and a 30% "non-connected" disability rating based on her migraines. (Id.)[4]  Plaintiff testified that she attended school between 2001 and 2004 to study computer electronics. (Id. at 426-27.)  She stated that her 18-year-old son resided with her. (Id. at 427.)  She testified that she could still drive, but that her driving skills were deteriorating. (Id.)  She stated that she could still cook, though not as often as before, and that she needed assistance to go grocery shopping, but that she could still pay her bills. (Id.)

Plaintiff testified that she was absent many times while enrolled in school. (Id. at 430.)  She stated that she was still able to pass her classes as there were many group projects and the other group members would do the work for her. (Id. at 431.)  She testified that although she learned a little bit about computers, she did not retain a lot of the information she had learned. (Id.)  After finishing school, Plaintiff looked for work but could not meet job demands, such as putting on a tool belt, without an increase in her symptoms. (Id. at 428-29.)  She stated that she did nothing during the day other than attending doctors' appointments. (Id. at 429.)

Plaintiff testified that she still experiences pain in her neck, spine, lower back, knees, and ankle. (Id. at 434.)  In order to alleviate her pain, she takes hot showers, uses BenGay, takes painkillers, and stretches. (Id.)  Over the past year, she experienced pain levels that were higher than normal about four

---

[4]Plaintiff's counsel advised during the administrative hearing that Plaintiff had applied to have her "non-service connected" headaches changed to "service-connected." (Id. at 441.)

days per week.  (Id. at 436.)  She testified that she stays in
bed all day on days such as those.  (Id.)  She also testified
that she does not do anything for fun, does not watch television,
does not read for pleasure, and uses the computer only to do
research on her condition.  (Id. at 438.)  She stated that she
could sit for a maximum of twenty minutes at a time.  (Id.)  She
tries to refrain from lifting more than ten or fifteen pounds.
(Id. at 439.)

Upon questioning by Sidney Bolter, M.D., the medical expert
("ME"), Plaintiff testified that she could not go out and walk
because it irritated her ankle and knee areas, and could not
force herself to exercise because it caused her pain.  (Id. at
443.)

**B.   Medical Expert Testimony**

The ME, a psychiatrist, testified that Plaintiff had
depression, not otherwise specified (Listing 12.04 of the Listing
of Impairments),[5] secondary to pain, a somatoform disorder
(Listing 12.07),[6] and chronic pain syndrome (Listings 12.07A3 and
12.07).  (Id. at 445.)  He testified that fibromyalgia is a "very
controversial diagnosis" but that it had been declared a disease
by the American Rheumatological Association and the Center for
Disease Control.  (Id.)  He opined that Plaintiff had a moderate

---

[5]The Listing of Impairments in the Social Security Regulations
("Listings") sets forth certain impairments which are considered to be
of sufficient severity to prevent the performance of any gainful
activity.  See 20 C.F.R. § 404.1525(a); 20 C.F.R. pt. 404, subpt. P,
app. 1.

[6]Somatoform disorders are defined in the Listings as "Physical
symptoms for which there are no demonstrable organic findings or known
physiological mechanism."  20 C.F.R. pt. 404, subpt. P, app. 1, §
12.07.

07cv0276

limitation on activities of daily living and a marked limitation on social functioning.  (Id.)  He also opined that Plaintiff had a mild limitation on concentration, persistence, and pace, but that any work beyond one or two step tasks would result in a moderate to marked limitation.  (Id.)  He stated that Plaintiff should participate in a non-public job, and should have minimal contact with peers and supervisors.  (Id. at 445-46.)

### C.   Vocational Expert Testimony

Vocational expert ("VE") witness Gloria Lasoff also testified at the hearing.  In response to a hypothetical question posed by the ALJ, she testified that a person with Plaintiff's education and prior work experience who was "limited to simple, repetitive tasks, non-public contact, [and] minimal co-worker and supervisor interaction" would not be able to return to Plaintiff's prior work.  (Id. at 449.)  Such a person could, however, perform other work, including as an assembler, Dictionary of Occupational Titles ("DOT") number 754.687-010, inspector/hand packager, DOT number 559.687-074, and production assembler, DOT number 706.687-010.  (Id. at 449-50.)  The VE further testified that an individual who was absent more than three times per month would not be able to sustain any of the above cited jobs.  (Id. at 451.)  She also stated that each of these jobs would require that a person perform a certain amount of work within an eight hour day, and thus these positions were not "time unlimited."  (Id. at 451-52.)

### V.   THE ALJ DECISION

After considering the record, ALJ Carletti made the following findings:

.   .   .   .

2.   The claimant has not engaged in substantial gainful
     activity since the alleged onset of disability.

3.   The claimant's depressive disorder, not otherwise
     specified; a cognitive disorder, and a somatoform
     disorder are considered "severe" based on the
     requirements in the Regulations [citation omitted].

4.   These medically determinable impairments do not meet or
     medically equal one of the listed impairments in [the
     Social Security Regulations].

5.   The undersigned finds the claimant's allegations
     regarding her limitations are not totally credible for
     the reasons set forth in the body of the decision.

6.   The claimant has the following residual functional
     capacity to perform simple, repetitive tasks in a
     nonpublic work setting if she has limited contact with
     coworkers and supervisors.

.   .   .   .

8.   The claimant is unable to perform any of her past
     relevant work [citation omitted].

.   .   .   .

12.  Considering the types of work that the claimant is
     still functionally capable of performing in combination
     with the claimant's age, education and work experience,
     she could be expected to make a vocational adjustment
     to work that exists in significant numbers in the
     national economy.  Examples of such jobs include work
     as an assembler, inspector and product assembler of
     which there are 70,000; 140,000; and 400,000 jobs,
     respectively, in the national economy.  This finding is
     based on expert vocational testimony provided at the
     hearing.

13.  The claimant was not under a "disability," as defined
     in the Social Security Act, at any time through the
     date of this decision [citation omitted].

(Id. at 18-19.)

## VI.   STANDARD OF REVIEW

To qualify for disability benefits under the Social Security
Act, an applicant must show that:  (1) He or she suffers from a
medically determinable impairment that can be expected to result

in death or that has lasted or can be expected to last for a continuous period of twelve months or more, and (2) the impairment renders the applicant incapable of performing the work that he or she previously performed or any other substantially gainful employment that exists in the national economy.  See 42 U.S.C.A. § 423(d)(1)(A), (2)(A) (West 2004).  An applicant must meet both requirements to be "disabled."  Id.  Further, the applicant bears the burden of proving that he or she was either permanently disabled or subject to a condition which became so severe as to disable the applicant prior to the date upon which his or her disability insured status expired.  Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995).

### A.   Sequential Evaluation of Impairments

The Social Security Regulations outline a five-step process to determine whether an applicant is "disabled."  The five steps are as follows:  (1) Whether the claimant is presently working in any substantial gainful activity.  If so, the claimant is not disabled.  If not, the evaluation proceeds to step two. (2) Whether the claimant's impairment is severe.  If not, the claimant is not disabled.  If so, the evaluation proceeds to step three.  (3) Whether the impairment meets or equals a specific impairment listed in the Listing of Impairments.  If so, the claimant is disabled.  If not, the evaluation proceeds to step four.  (4) Whether the claimant is able to do any work she has done in the past.  If so, the claimant is not disabled.  If not, the evaluation continues to step five.  (5) Whether the claimant is able to do any other work.  If not, the claimant is disabled. Conversely, if the Commissioner can establish there are a

1   significant number of jobs in the national economy that the
2   claimant can do, the claimant is not disabled.   20 C.F.R. §
3   404.1520; see also Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th
4   Cir. 1999).

5       **B.   Judicial Review**

6       Sections 205(g) and 1631(c)(3) of the Social Security Act
7   allow unsuccessful applicants to seek judicial review of the
8   Commissioner's final agency decision.   42 U.S.C.A. §§ 405(g),
9   1383(c)(3).   The scope of judicial review is limited.   The
10  Commissioner's final decision should not be disturbed unless:
11  (1) The ALJ's findings are based on legal error or (2) are not
12  supported by substantial evidence in the record as a whole.
13  Schneider v. Comm'r of Soc. Sec. Admin., 223 F.3d 968, 973 (9th
14  Cir. 2000).   Substantial evidence means "more than a mere
15  scintilla but less than a preponderance; it is such relevant
16  evidence as a reasonable mind might accept as adequate to support
17  a conclusion."   Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir.
18  1995).   The Court must consider the record as a whole, weighing
19  both the evidence that supports and detracts from the ALJ's
20  conclusion.   See Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir.
21  2001); Desrosiers v. Sec'y of Health & Human Servs., 846 F.2d
22  573, 576 (9th Cir. 1988).   "The ALJ is responsible for
23  determining credibility, resolving conflicts in medical
24  testimony, and for resolving ambiguities."   Vasquez v. Astrue,
25  547 F.3d 1101, 1104 (9th Cir. 2008) (citing Andrews, 53 F.3d at
26  1039).   Where the evidence is susceptible to more than one
27  rational interpretation, the ALJ's decision must be affirmed.
28  Id. (citation and quotations omitted).

07cv0276

1    Section 405(g) permits this Court to enter a judgment

2  affirming, modifying, or reversing the Commissioner's decision.

3  42 U.S.C.A. § 405(g).  The matter may also be remanded to the

4  Social Security Administration for further proceedings.  Id.

5  **VII.  DISCUSSION**

6    **A.  The ALJ Did Not Commit Reversible Error By Relying on**
       **the VE's Testimony Without Inquiring Whether It**
7      **Conflicted With the DOT**

8    Plaintiff argues that the ALJ's finding that a person

9  limited to "simple repetitive tasks" can perform the jobs of

10  assembler, inspector, and product assembler is not supported by

11  substantial evidence.  Pl.'s Mem. at 10.  Plaintiff contends that

12  the Reasoning Level required for these jobs, as set forth in the

13  DOT, demonstrates that they are not appropriate for a person

14  limited to simple repetitive tasks, and that the ALJ erred by not

15  asking the VE about this purported conflict between her testimony

16  and the information provided in the DOT.  Id. at 10-11.

17  Defendant counters that Reasoning Levels do not pertain to one's

18  residual functional capacity, and further contends that

19  Plaintiff's argument is not even supported by the cases in which

20  the courts considered DOT Reasoning Levels in the context

21  suggested by Plaintiff.  Def.'s Opp'n at 7.  Defendant further

22  asserts that even if the ALJ erred by not specifically asking the

23  VE whether her testimony deviated from the DOT, any such error

24  was harmless.  Id. at 8.

25    Social Security Ruling ("SSR") 00-4p states that before

26  relying on VE evidence to support a disability determination or

27  decision, the ALJ must inquire whether the VE testimony is

28  consistent with the DOT.  See SSR 00-4p, 2000 WL 1898704, at *2;

see also Massachi v. Astrue, 486 F.3d 1149, 1152 (9th Cir. 2007).
When there is an apparent unresolved conflict, the ALJ must
inquire, on the record, about the inconsistency, and must obtain
a reasonable explanation for the conflict.  SSR 00-4p, 2000 WL
1898704, at *2.  The failure to do so constitutes procedural
error.  Massachi, 486 F.3d 1149, 1153-54 & n.19.  Such error is
harmless, however, if there was no conflict or if the VE provided
sufficient support for his or her conclusion so as to justify any
potential conflicts.  Id. at 1154 n.19.

     Here, the VE's testimony provided that the jobs of
assembler, hand packager, and production assembler were
appropriate for a person with a limitation to simple repetitive
tasks.  (Admin. R. at 449-50.)  Plaintiff, noting that the DOT
indicates that each of these jobs has a Reasoning Level of 2,
argues that these jobs are beyond the ability to perform simple
repetitive tasks.  (Pl.'s Mem. at 10-11.)

     The DOT defines a position with a Reasoning Level of 2 as
requiring the worker to "[a]pply commonsense understanding to
carry out detailed but uninvolved written or oral instructions []
and [d]eal with problems involving a few concrete variables in or
from standardized situations."  DOT, app. C.  Other courts have
found a Reasoning Level of 2 to be consistent with a limitation
to simple repetitive tasks.  See, e.g., Hackett v. Barnhart, 395
F.3d 1168, 1176 (10th Cir. 2005) ("[L]evel-two reasoning appears
more consistent with Plaintiff's [residual functional capacity]"
to perform "simple and routine work tasks"); Meissl v. Barnhart,
403 F.Supp.2d 981, 984-85 (C.D. Cal. 2005) (finding that a
plaintiff's ability to perform "simple tasks . . . that had some

1   element of repetitiveness to them" indicated a reasoning level of

2   two); <u>Flaherty v. Halter</u>, 182 F.Supp.2d 824, 850 (D. Minn. 2001)

3   ("the DOT's level two reasoning requirement did not conflict with

4   the ALJ's prescribed limitation" to "simple, routine, repetitive,

5   concrete, tangible tasks").  Furthermore, this Court, in a recent

6   decision, made the same finding.  <u>See</u> <u>Harrington v. Comm'r of</u>

7   <u>Soc. Sec. Admin.</u>, 2008 WL 4492614, at *10-11 (S.D. Cal. 2008),

8   *modified in part*, 2009 WL 102689 (S.D. Cal. Jan. 14, 2009).

9   Thus, the Court finds that Plaintiff's contention that jobs

10  requiring level two reasoning are inconsistent with her

11  limitation to simple repetitive tasks is without merit.[7]

12      Because the VE's testimony did not conflict with the DOT,

13  the ALJ's failure to ask the VE whether there was any such

14  conflict constituted harmless error.  <u>Massachi</u>, 486 F.3d at 1154

15  n.19; <u>Harrington</u>, 2009 WL 102689, at *2.  Thus, the ALJ did not

16  commit reversible error by relying on the testimony of the VE.

17      **B.   The ALJ Did Not Meet His Burden of Articulating**
        **Specific and Legitimate Reasons for Rejecting Dr.**
18      **Lang's Opinion**

19      Plaintiff next contends that the ALJ improperly rejected the

20  opinion of Dr. Lang, Plaintiff's treating psychologist.

21  Plaintiff argues that Dr. Lang's opinions were not controverted,

22  and contends that none of the four reasons set forth by the ALJ

23  to reject Dr. Lang's opinion was either "clear and convincing" or

24  "specific and legitimate."  Pl.'s Mem. at 13.  Defendant argues

25

26      [7]Defendant's argument that Reasoning Levels of jobs have no
    relation to a claimant's residual functional capacity (<u>see</u> Def.'s
27  Opp'n at 7) is also without merit.  As the court in <u>Meissl</u> stated,
    "[T]he one vocational consideration directly on point with [a
28  limitation to simple repetitive tasks] is a job's reasoning level
    score."  <u>Meissl</u>, 403 F.Supp.2d at 983.

in opposition that Dr. Lang's opinion was controverted by Dr. Bolter, the ME, and that the ALJ properly articulated specific and legitimate reasons to reject her opinion.  Def.'s Opp'n at 8-9.

More weight is given to a treating physician's opinion than to the opinion of a nontreating physician.  Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989).  Likewise, greater weight is accorded to the opinion of an examining physician than a nonexamining physician.  Andrews, 53 F.3d at 1041.  The ALJ may disregard the opinion of a treating physician, whether or not it is controverted.  Id.  If the treating physician's opinion is uncontroverted, the ALJ may reject the opinion only by articulating clear and convincing reasons.  Id.  "Where . . . a nontreating source's opinion contradicts that of the treating physician but is not based on independent clinical findings, or rests on clinical findings also considered by the treating physician, the opinion of the treating physician may be rejected only if the ALJ gives specific, legitimate reasons for doing so that are based on substantial evidence in the record."  Id. (citing Magallanes, 881 F.2d at 751, 755).  If, on the other hand, the opinion of the claimant's treating physician is contradicted, and the opinion of a nontreating source is based on independent clinical findings that differ from those of the treating physician, the opinion of the nontreating source may itself constitute substantial evidence, and it is then solely the province of the ALJ to resolve the conflict.  Id. (citing Magallanes, 881 F.2d at 751).

Here, Dr. Lang's opinion that Plaintiff would have

1  difficulty working at a regular job on a sustained basis and that

2  she had marked limitations in three areas of functionality (see

3  Admin. R. at 363) was contradicted by the ME's opinion that

4  Plaintiff had less than marked limitations in all but one area of

5  functionality (see id. at 445).  Dr. Lang and the ME also had

6  differing diagnoses of Plaintiff's conditions:  Dr. Lang noted

7  that Plaintiff's diagnoses consisted of "recurrent depressive

8  disorder" and "fibromyalgia," each of which exacerbated the

9  other, while the ME testified that Plaintiff had "depression, not

10  otherwise specified, secondary to pain", which is a "somatoform

11  disorder", and "chronic pain syndrome."  (Id. at 362-63, 445.)[8]

12  Thus, in order to reject Dr. Lang's opinion, the ALJ was required

13  to articulate specific, legitimate reasons for doing so based on

14  substantial evidence in the record.  Andrews, 53 F.3d at 1041.[9]

15       The ALJ articulated the following four reasons for rejecting

16

17       [8]The Court observes that Dr. Lang was not making the diagnosis of
18  fibromyalgia; rather, she was confirming a diagnosis that had
previously been made by Plaintiff's other treatment providers.
Additionally, her opinion that Plaintiff cannot maintain employment
19  was based primarily upon Plaintiff's mental, not physical impairments;
Dr. Lang was merely noting that Plaintiff's depression and
20  fibromyalgia each exacerbate the other.  See id. at 363.  Thus, Buxton
v. Halter, 246 F.3d 762, 775 (6th Cir. 2001), cited by Defendant (see
21  Def.'s Opp'n at 9) is inapplicable.

22       [9]The ME's opinion itself does not constitute substantial evidence
as it was not based upon independent clinical findings.  Independent
23  clinical findings can be either (1) diagnoses that differ from those
offered by another physician and that are supported by substantial
24  evidence or (2) findings based on objective medical tests that the
treating physician has not herself considered.  Orn v. Astrue, 495
25  F.3d 625, 632 (9th Cir. 2007) (citations omitted).  The first factor
is not met here because although the ME's diagnosis of a "somatoform
26  disorder" differed from Dr. Lang's diagnoses, there is no mention of
such a diagnosis anywhere in Plaintiff's medical records and thus,
27  without further explanation, the diagnosis is not supported by
substantial evidence in the record.  The second factor is not met
28  because the ME does not describe any objective medical tests that he
relied on in formulating his opinions.

Dr. Lang's opinion:

> First, while Dr. Lang has given the claimant a current and past year Global Assessment of only 51, the claimant's treating psychiatrist has reported a Global Assessment of Functioning of 62 [citation omitted].

> Second, nor is there any evidence that the claimant has had any psychiatric hospitalizations or emergency room treatment or mental illness.

> Third, the claimant was able to obtain an Associate of Arts degree in computer electronics after attending school from 2001 to November 2004.  Surely, the claimant's ability to obtain a degree in computer electronics subsequent to [the] alleged onset date is markedly at odds with Dr. Lang's assessment of her mental residual functional capacity.

> Fourth, nothing in the claimant's treatment records from the Veterans Administration Medical Center supports Dr. Lang's assessment of the claimant's mental residual functional capacity.

(Admin. R. at 16.)

The ALJ's first stated reason is not sufficient to discount Dr. Lang's opinion.  Although it is true that Dr. Warner, a staff psychiatrist at the VA, found that Plaintiff had a GAF score of 62 (see id. at 234), this finding was made in 2002, three years before Dr. Lang found that Plaintiff's GAF score for 2005 and the preceding year was 51.[10]  Indeed, a GAF score of 62 in 2002 followed by a GAF score of 51 in 2005 is consistent with the continued deterioration of Plaintiff's condition as reflected in the record.  Plaintiff is correct that the ALJ failed to explain how GAF score assessments made three years apart invalidates Dr. Lang's opinion.  Pl.'s Mem. at 13.

Although the ALJ's second proffered reason is a true statement, it, too, is not sufficient to discount Dr. Lang's

_____

[10]The Court also observes that the ALJ failed to mention that Dr. Warner also assigned a lower GAF score of 60 on two prior occasions in 2002.  (See Admin. R. at 235, 236.)

07cv0276

1  assessment.   The ALJ has provided no explanation of how this
2  invalidates Dr. Lang's opinion.   The Court can infer, as
3  Defendant does, that the ALJ meant that because Plaintiff's
4  mental condition was not sufficiently serious to warrant
5  hospitalization, it was not disabling.   See Def.'s Opp'n at 9.
6  The Court disagrees, however, that hospitalization or emergency
7  room treatment is necessary to render a mental impairment
8  disabling, and Defendant cites no authority to the contrary.

9       The Court finds that the ALJ's third stated reason for
10 rejecting Dr. Lang's opinion, though arguable, is sufficiently
11 specific and legitimate.   The fourth reason, however, is not.
12 The record is replete with evidence indicating that Plaintiff's
13 depression, alone or in conjunction with her physical symptoms,
14 presented functional limitations and affected her ability to work
15 and attend school.   See, e.g., Admin. R. at 235, 236 (reflecting
16 GAF scores of 60, indicative of "moderate" difficulties in
17 functioning); 200, 203, 209, 318 (reflecting difficulties at and
18 absences from school); 204 (Plaintiff's report that school and
19 part time work study exacerbated symptoms); 299
20 (neuropsychological consultant observing that psychiatric
21 symptoms could affect Plaintiff's cognitive weaknesses); 413
22 (vocational assessment indicating that Plaintiff's return to
23 competitive employment was "questionable"), and 415
24 (determination by vocational rehabilitation division at VA that
25 it was no longer feasible for Plaintiff to return to work).

26      The Court thus finds that the ALJ properly articulated only
27 one specific and legitimate reason for rejecting Dr. Lang's
28 opinion regarding Plaintiff's disability and limitations.   This

07cv0276

1   sole reason is insufficient to convince the Court that Dr. Lang's

2   opinion was properly rejected.  As discussed above, the record

3   contains ample evidence that Plaintiff encountered many

4   difficulties while attending school, and it did, after all, take

5   Plaintiff four years to complete a two year degree.  Thus, the

6   Court finds that the ALJ committed reversible error.  The Court

7   accordingly recommends that the case be remanded for further

8   consideration of Dr. Lang's opinions.[11]

9      **C.   The ALJ Failed to Articulate Clear and Convincing
           Reasons for Finding That Plaintiff's Subjective Symptom**
10         **Testimony Was Not Credible**

11      Finally, Plaintiff argues that the ALJ's rejection of her

12   subjective complaints is based on legal error and is not

13   supported by substantial evidence.  Pl.'s Mem. at 14-16.  In

14   determining a claimant's residual functional capacity, the ALJ

15   must consider all relevant evidence in the record, including

16   medical records, lay evidence, and "the effects of symptoms,

17   including pain, that are reasonably attributed to a medically

18   determinable impairment."  See Robbins v. Soc. Sec. Admin., 466

19   F.3d 880, 883 (9th Cir. 2006) (citing SSR 96-8p, 1996 WL 374184,

20   _____

21   [11]Plaintiff argues that Dr. Lang's opinion should be credited "as
     a matter of law."  Pl.'s Mem. at 14.  There is a split in authority,

22   however, over whether the "credit-as-true" rule is mandatory or
     discretionary in the Ninth Circuit.  See Vasquez v. Astrue, 547 F.3d

23   1101, 1106 (9th Cir. 2008).  In any event, the decision whether to
     remand for further proceedings or to simply award benefits is within

24   the discretion of the court.  McAllister v. Sullivan, 888 F.2d 599,
     603 (9th Cir. 1989).  "If additional proceedings can remedy defects in

25   the original administrative proceedings, a social security case should
     be remanded."  Lewin v. Schweiker, 654 F.2d 631, 635 (9th Cir. 1981);

26   see also McAllister, 888 F.2d at 603 ("[A] remand for further
     proceedings is appropriate.  There may be evidence in the record to

27   which the Secretary can point to provide the requisite specific and
     legitimate reasons for disregarding the testimony of [the] treating

28   physician.  Then again, there may not be.  In any event, the Secretary
     is in a better position than this court to perform this task.").

at *5).  "Careful consideration must be given to any available information about symptoms because subjective descriptions may indicate more severe limitations or restrictions than can be shown by objective medical evidence alone."  SSR 96-8p, 1996 WL 374184, at *5.  When considering a claimant's subjective symptom testimony, "if the record establishes the existence of a medically determinable impairment that could reasonably give rise to the reported symptoms, an ALJ must make a finding as to the credibility of the claimant's statements about the symptoms and their functional effect."  Robbins, 466 F.3d at 883 (9th Cir. 2006) (citations omitted).  "While an ALJ may find testimony not credible in part or in whole, he or she may not disregard it solely because it is not substantiated affirmatively by objective evidence."  Id.  Rather, an ALJ may only find a claimant not credible by making specific findings as to credibility and stating clear and convincing reasons to discount the claimant's subjective symptom testimony.  Id.

Here, the ALJ set forth the following reasons for finding that Plaintiff was not credible:

> First, numerous treating physicians have cited the absence of any medical explanation for the claimant's myriad of symptoms [citation omitted].  Despite her complaints of severe neck pain radiating into her arms, a December 1999 MRI scan revealed only mild narrowing at the C5-6 level of her cervical spine, with no evidence of cervical radiculopathy consistent with her complaints of bilateral arm pain and weakness, such as frank disc herniation, nerve root impingement of spinal stenosis [citation omitted].  January 2004 x-rays of the claimant's cervical spine were also within normal limits [citation omitted].  An EMG/nerve conduction study of her upper extremities was also negative for any significant pathology [citation omitted].
>
> Second, despite the claimant's complaints of recurrent migraine headaches, an MRI of the claimant's brain was within normal limits [citation omitted].  The claimant

denied any improvement, despite the usage of numerous medications prescribed by treating sources, and has indicated that her migraine headaches have responded to adjustments to her "attitude" [citation omitted].

Third, x-rays of the claimant's knees and ankles have been within normal limits, despite her complaints of severe knee pain [citation omitted].

Fourth, the claimant has been described as having full motor strength in her arms, despite her complaints of pain radiating from her neck into both arms [citation omitted].

Fifth, despite the claimant's complaint of severe right shoulder pain, no treating or examining physician has ever recommended surgery for her shoulder.  Indeed, the claimant has been described by treating sources as "not a surgical candidate" [citation omitted].  At most, the claimant has received only a very limited number of steroid injections in her right shoulder.

Sixth, Dr. Lang acknowledged that the claimant's psychiatric condition exacerbates her pain and acknowledged that there is an interaction between the claimant's depression and her fibromyalgia, characterized by each condition exacerbating the other [citation omitted].

Seventh, the claimant's treatment records from the Veterans Administration Medical Center also reveal that she has a history of self-diagnosing, with almost hypochondriac behavior, which leads the undersigned to conclude that she does not have any physical impairment or combination of physical impairments which impose any significant work-related limitations.

(Admin. R. at 17.)[12]

Reasons 1 through 5 each concern the lack of objective medical evidence supporting Plaintiff's *physical* complaints. However, an ALJ clearly may not disregard a claimant's testimony regarding her symptoms solely because it is not substantiated affirmatively by objective evidence.  Robbins, 466 F.3d at 883.

---

[12]Defendant argues that Plaintiff's "uncooperativeness with her treatment" and her failure to follow her doctors' advice factored into the ALJ's determination of Plaintiff's credibility.  Def.'s Opp'n at 10.  As seen above, however, it did not.

07cv0276

Furthermore, Plaintiff alleges both physical *and* mental impairments.  None of these reasons sufficiently addresses why Plaintiff's testimony regarding her *mental* impairments is not credible.  Although these reasons may explain why the ALJ did not find that Plaintiff's fibromyalgia was "severe" at step 2 of the disability evaluation -- a finding that Plaintiff does not contest -- they provide no basis to discount the symptoms based upon Plaintiff's mental impairments.  See Robbins, 466 F.3d at 883 (the ALJ must make a *specific* finding as to the credibility of a claimant's statements about her reported symptoms and their functional effects); see also Orn, 495 F.3d at 635 ("[T]o discredit a claimant's testimony when a medical impairment has been established, the ALJ must provide 'specific, cogent reasons for the disbelief'").

The Court does not understand how the ALJ's sixth proffered reason for finding Plaintiff not credible weighs against Plaintiff, and Defendant has provided no explanation as to why this constitutes a clear and convincing reason to reject Plaintiff's subjective symptom testimony.  Indeed, in the Court's view, this statement appears to support Plaintiff's claim for disability.

The ALJ's seventh proffered reason for finding Plaintiff's testimony not credible is unsupported by the record.  The Court, after considering the record as a whole, fully disagrees with the ALJ that Plaintiff's medical records "reveal that she has a history of self-diagnosing, with almost hypochondriac behavior." (Admin. R. at 17.)  Nowhere in Plaintiff's extensive records is it even suggested that Plaintiff is a hypochondriac.  The ALJ's

statement that Plaintiff has a history of self-diagnosing appears
to rest on his earlier observation that, "[T]he claimant's
treatment records confirm that, after reading a book, the
claimant diagnosed herself with fibromyalgia and chronic fatigue
syndrome." (Id. at 15 (citing id. at 194).)  This is an untrue
statement, however.  As the record itself makes clear, Plaintiff
told Dr. Lang on June 21, 2004 that she agreed that these
diagnoses, *which had previously been offered by her VA medical
providers*, were appropriate for her after reading a book on these
topics.  See id. at 350 (Dr. Patel's suggestion on June 15, *2000*
that Plaintiff had fibromyalgia), 282 (VA record dated July 29,
*2003* reflecting diagnosis of chronic fatigue syndrome).
Plaintiff did not diagnose herself with these conditions.
Indeed, the suggestion that Plaintiff read about these conditions
came from Dr. Patel.  Id. at 350 (treatment note reflecting that
Plaintiff had been advised of books to read).

The Court believes that this erroneous assumption may have
disfavorably colored the ALJ's entire assessment of Plaintiff's
conditions and credibility.  Therefore, upon remand, the ALJ
shall reconsider Plaintiff's credibility.  If he wishes to reject
Plaintiff's testimony regarding the limitations imposed by her
mental impairments, he must point to "specific facts in the
record" for doing so, or else accept Plaintiff's testimony.  See,
e.g., Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993).

**VIII.   CONCLUSION**

For the reasons set forth above, Plaintiff's Motion for
Summary Judgment should be **GRANTED IN PART** and **DENIED IN PART**,
Defendant's Cross-Motion for Summary Judgment should be **GRANTED**

1 | **IN PART** and **DENIED IN PART**, and the case should be remanded for

2 | further proceedings.

3 |     This report and recommendation will be submitted to the

4 | Honorable M. James Lorenz, United States District Judge assigned

5 | to this case, pursuant to the provisions of 28 U.S.C.

6 | § 636(b)(1).  Any party may file written objections with the

7 | Court and serve a copy on all parties on or before **February 18,**

8 | **2009**.  The document should be captioned "Objections to Report and

9 | Recommendation."  Any reply to the Objections shall be served and

10 | filed on or before **March 2, 2009**.  The parties are advised that

11 | failure to file objections within the specified time may waive

12 | the right to appeal the district court's order.  Martinez v.

13 | Ylst, 951 F.2d 1153 (9th Cir. 1991).

14 |     **IT IS SO ORDERED.**

15 | DATED:  February 3, 2009

16 |                                     _____

17 |                                     Jan M. Adler
                                        U.S. Magistrate Judge

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

07cv0276